MICHAELIS et al. v. LARKIN et al.

(Circuit Court, E. D. Missouri, E. D. February 7, 1899.)

No. 4,026.

1. PATENTS—CONSTRUCTION OF CLAIMS—AMENDMENT OF APPLICATION.
   The rejection of a claim in an application for a patent, and its subsequent modification by the applicant, and his acceptance of a patent on the amended claim, amounts to a disclaimer as to the matter eliminated.

2. SAME—INFRINGEMENT—IMPROVEMENT IN MANUFACTURE OF CHLOROFORM.
   The Michaelis patent, No. 322,194, claim 2, for an improvement in the manufacture of chloroform, construed, and held valid, but limited by the specification and the proceedings in the patent office to the process of manufacturing chloroform from the ketones having a higher boiling point than acetone, and using as the foundation a crude or "brown" acetate, as distinguished from the commercially purified or "gray" acetates. As so construed and limited, the patent is not infringed by the manufacture of chloroform from acetone, derived from the dry distillation of the gray acetate of lime, the distillate containing 86 per cent. of acetone, though it also contains, as a necessary incident to distillation, which cannot practicably be separated, from 3 to 5 per cent. of the higher boiling ketones, covered by the patent.

This is a suit in equity by Gustavus Michaelis and others against Edward Hiles Larkin and others for the alleged infringement of a patent.

Dickerson & Brown and Campbell & Ryan, for complainants.
Paul Bakewell, for defendants.

ADAMS, District Judge. This is a suit for the infringement of letters patent of the United States, No. 322,194, for certain new and useful improvements in the manufacture of chloroform and acetic acid, or purified acetates, dated July 14, 1885. The patentee describes his invention as follows:

"This invention is based upon the discovery that when a crude acetate, as of lime, is subjected to a dry distillation, only very small quantities of acetone, $CH_3COCH_3$, boiling at 56° centigrade, are formed, while very considerable quantities of dimethylacetal, $C_2H_4(OCH_3)$ 2, boiling between 60° and 65° centigrade; ethylmethylacetal, $C_2H_4(OC_2H_5)OCH_3$, boiling at 85° centigrade; methyldimethylketone, $CH_3COCH_2CH_3$, boiling between 75° and 77° centigrade; methylethylketone, $CH_3COC_2H_5$, boiling between 75° and 80° centigrade; diethylketone, $C_2H_5COC_2H_5$, boiling between 75° and 80° centigrade; metacetone, $C_6H_{10}O$, boiling between 82° and 86° centigrade,—and other still higher boiling ketones, as dumasin, and

other liquids, together with a large quantity of an apparently oily substance, which also yields some of the before-mentioned ketones, etc., in solution, are the result of the process. This invention is based upon the further discovery that while pure acetone yields, when distilled with the hypochlorite, only 33 per cent. of chloroform, the above-enumerated ketones and other liquids, all of which possess higher boiling points than does acetone, will yield, when freed from water and treated with a hypochlorite, chloroform in the large and unprecedented quantity of measure for measure. This yield is due to the fact that while a purified acetate, say of lime, yields larger quantities of acetone, and only (comparatively speaking) small quantities of foreign bodies, the crude acetate of lime \* \* \* gives, when subjected to the process of dry distillation, as borne out by actual experiment, just the opposite result, viz. small quantities of acetone and larger quantities of foreign bodies, varying in boiling point between 60° and 180° centigrade, respectively."

Another branch of the discovery relates to the partial purification of the crude acetate, after the elimination therefrom of the chloroform producing agents, leaving a residue which may be treated for the production of acetic acid or purified acetates. This residue, it is said, is "in a most favorable condition for conversion into acetic acid, or purified acetates." In the view I entertain of this case, and in the light of the claim alleged to be infringed, it is unnecessary to consider this second branch of the discovery.

The claim alleged to be infringed by the defendants is claim 2 of the patent, which is as follows:

"The production of chloroform from the liquid products resulting from the decomposition of crude acetates at high temperatures, by subjecting said liquid products to the action of hypochlorite, and removing the chloroform therefrom by distillation, substantially as described."

A very important question presented by the record, and which received much attention at the argument, must be met at the outset, and that is whether this second claim of the patent, when properly construed, excludes the use of acetone as a chloroform yielding agent, in the patented process of complainants.

The description of the invention already referred to, as well as the proofs in the case, clearly show that acetone distills at 56° centigrade. This is the lowest temperature at which any of the chloroform yielding agents referred to in the patent are distilled over. The patent teaches that the boiling point for all the other alleged chloroform yielding agents ranges from 60° to 180° centigrade. Accordingly, the claim of the patent under consideration, in so far as it calls for the treatment of liquids produced from the decomposition of acetates at high temperature, would naturally seem to suggest a contrast or comparison between such liquids and that one which the patent disparagingly refers to as boiling at the very low temperature of 56°, and as producing a comparatively small amount of chloroform. Moreover, the state of the art in 1884, the date of the application for this patent, discloses that acetone, which is a product resulting from the dry distillation of a crude acetate, as of lime, will produce chloroform, when subjected to the action of a hypochlorite. It does not appear that chloroform had, prior to 1884, been produced on any commercial scale from acetone. Up to that date it had generally been the result of a distillation of ethel alcohol. But it was, prior to 1884, established as a scientific fact, by repeated laboratory experiments, and had been proclaimed in many

pharmaceutical and chemical works, that the liquid then well known commercially, as well as chemically, as "acetone," would, when treated with a hypochlorite, produce chloroform. This scientific fact, therefore, was public knowledge, and all its advantages and results, whether then fully appreciated or not, belonged to the public. Accordingly, when the patentee presented to the patent office his first application, in which he claimed "(1) the production of chloroform from the ketones, resulting from the decomposition of an acetate at high temperature, which consists in mixing said ketones with a hypochlorite and distilling the same, substantially as described," it is not strange, when it is recalled that acetone is included in the generic term "ketone," that his application was rejected, on reference to Watt's and Wurz's Dictionaries of Chemistry, in which it is said that chloroform may be obtained from, among other things, acetone. After its rejection, such proceedings were had before the patent commissioner, as appears from the arguments of the patentee's solicitors and the subsequent amendments of the specifications and claims, as evinces to my mind a purpose to disclaim the use of acetone as a fluid available to the patentee in his process. It appears that from the second claim, as finally drawn and allowed, the generic term "ketone" is eliminated, and the patentee claims a process for the production of chloroform by subjecting the liquid products resulting from the decomposition of acetates at high temperature to the action of hypochlorite.

This seems to me to be a confession on the part of the patentee that the use of the particular low-boiling fluid known as "acetone" had become public property, and that the monopoly of the patent should be limited to the use of the high-boiling ketones referred to in the specifications. Whether the prior art disclosed that chloroform could be produced out of chemically pure acetone only, as is contended by complainants' counsel, or whether it disclosed that it could be produced out of commercial or impure acetone, as is contended by defendants' counsel, is immaterial. The fact remains that the prior art so disclosed the process of manufacturing chloroform from acetone, whether pure or impure, as, upon reference to it by the commissioner of patents, the patentee acquiesced, and amended his specifications and claims, and accepted a patent excluding the use of acetone as a part of his process. This action of the patentee amounts to an effectual disclaimer of any monopoly in the use of acetone for the production of chloroform. Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 14 Sup. Ct. 627; Brill v. Car Co., 90 Fed. 666, and cases there cited. The complainants' patent must, therefore, receive a construction limiting the patented process to the manufacture of chloroform from ketones other than acetone, and to those ketones specifically described or generally referred to in the specifications as boiling at temperatures ranging from 60° to 180° centigrade.

The proof in the case makes it extremely doubtful if the process of the patent, limited, as already indicated by the exclusion of acetone as an available property, is of any practical utility. In fact, it seems to me quite clear from the proofs that there is very little of the chloroform yielding agents in all of the higher-boiling keynotes described or

referred to in the patent. There are certainly no such quantities of such agents as will, in the language of the specification, "yield, when freed from water and treated with a hypochlorite, chloroform in the large and unprecedented quantity of measure for measure." And it is in no sense true that the crude acetate of lime, when subjected to the process of dry distillation, gives, as borne out by actual experiments, "small quantities of acetone and larger quantities of foreign bodies, varying in boiling point between 60° and 180° centigrade." These and other statements of the patent, considered in the light of the proofs in the case, are conceded to be erroneous, and are made the basis of a defense, under the provisions of section 4920, Rev. St. U. S., to the effect that the patent was obtained by fraudulent misrepresentations. The evidence tends strongly to show that some of these higher-boiling liquids, as represented by the chemical formulas employed in the specification, have no known existence, and that others contain no chloroform yielding agents whatsoever, and the balance only a small and inconsequential percentage of such agents, too small to be of any practical value, in and of themselves, for the production of chloroform. In addition to this, there is no evidence in this record showing that the process of the patent involving the distillation and refinement of these higher ketones alone, although pointed out 15 or 16 years ago in the patent now under consideration, has ever been employed in the manufacture of chloroform. These last-mentioned facts, and others of like character, are made the basis of a defense of want of utility or patentable invention. Notwithstanding the force with which these defenses are presented, I am not disposed to rule the patent void for fraudulent misrepresentations made in securing it, or invalid for want of utility or patentable invention. It may be that the common tests of good faith and utility are unsafe, when applied to the mysterious processes of chemical action, and I am disposed to give the patentee the advantage of any such possible doubt.

Construing the patent, therefore, as a valid grant of a monopoly to the process for manufacturing chloroform out of the higher ketones described, and excluding the well-known chloroform producing agent, "acetone," as one of such ketones, the next question for determination is whether the defendants are shown to have infringed this process. The processes of both complainants and defendants begin with the dry distillation of wood. This results in pyroligneous acid. This pyroligneous acid, when treated with slaked lime, produces what is called and known commercially as "brown acetate of lime." This same pyroligneous acid, when again distilled and refined by itself, produces what is known as "refined pyroligneous acid"; and this last product, when treated with slaked lime, produces what is called and known commercially as "gray acetate of lime." The proof is clear that the defendants, who are large manufacturers of chemicals, employ this gray acetate exclusively, and from the dry distillation thereof produce a fluid which, when further distilled, produces acetone as the third distillant. This third distillant is recognized as "commercial acetone," is sold as such by the defendants, and from it the defendants produce their chloroform. This third distillant of the defendants, the proof shows, contains about 86 per cent. of pure acetone; the other 14 per

cent. is composed of water, inert bodies, and some small quantity, not exceeding 3 to 5 per cent., of acetone equivalents of the higher ketones. The question now is whether the use of a substance containing this large percentage of pure acetone constitutes an infringement of complainants' patent, because there is also the trace, not exceeding 3 to 5 per cent., of the acetone equivalents of the higher ketones, which is the process of their patent for the production of chloroform.

In answering this question it becomes important to consider the intent and purpose of the parties, as manifested in the patent, and in the processes or steps taken to produce results. Scrutiny of the specifications and claims of the patent discloses that the complainants start with a crude acetate, say of lime; that is to say, with such an acetate as, when subjected to dry distillation, produces the minimum quantity of acetone. Their desideratum is, therefore, in accordance with the limitations imposed upon their grant, which, as already seen, excludes acetone as an available substance, to employ such crude or raw material in the initiative of their process as contains the least quantity of that excluded substance, and the greatest quantity of other substances, from which may be obtained the particular fluid available to their use under their patent. In harmony with this desideratum, the specifications contain frequent expressions of a purpose to employ only crude acetates, distinguish between "crude" and "purified" acetates, and point out that the "crude" acetate yields little acetone, while the "purified" yields much acetone, and that the "crude" yields much of the other substances from which the higher-boiling ketones are derived, while the "purified" contains little of these desired substances. The second claim of the patent, which alone is alleged to be infringed, expressly calls for the decomposition of crude acetates. The proof shows that, at the time of the application for the patent in suit, there were only two commercially recognized acetates, namely, brown and gray,—the brown, resulting from the treatment of pyroligneous acid with slaked lime; the gray, resulting from a redistilled and rectified pyroligneous acid, when treated with slaked lime. It is conceded in argument that the brown acetate is "crude," within the meaning of the patent. It is conceded that the gray is not as crude as the brown, but it is contended that the difference between them is only in degree, not quality. It is conceded that the gray acetate is somewhat more "purified" than the brown, but it is contended that it is nevertheless, within the meaning of the patent, a "crude" acetate, and that the words "purified acetate," as frequently used, and contrasted with "crude acetate," mean "chemically pure acetate."

It may be that both brown and gray acetates may be called "crude," when compared with "chemically pure acetate"; but, when considered in the light of the specifications and teachings of the patent, and in the light of the fact shown in the proofs, that only brown and gray acetates were commercially known as available substances for the production of chloroform, and also in the light of the fact that "chemically pure acetate" was not commercially known at all, I cannot escape the conviction that the patentee intended, by his placing the two words, "crude" and "purified," over against each other, as already pointed out to employ one as a standard of comparison for deter-

mining the meaning of the other, and, by his insistence upon the use of such acetate as produced the least acetone, he intended to appropriate the brown as the crude acetate, suitable to the purposes of his patent, and to exclude the use of the gray as the purified acetate, unsuitable to his purpose. The patent must have a reasonable construction. The terms and language employed must be so construed as to give effect to each and all of them, if possible, and must be construed in the light of the art to which the invention relates, as understood at the date of the specification for the patent. Giving due consideration to all these well-known rules of construction, it seems to me, inasmuch as the art then existing knew of but two commercial acetates, brown and gray, and inasmuch as "chemically pure acetate" was not known commercially, but, in fact, was only known as a laboratory curiosity, it would be an unnatural and forced construction to hold that the patentee, when he referred familiarly to "purified" acetate, as then in use, and available for the production of chloroform, meant the chemical curiosity known as "chemically pure acetate,"—especially so, when there was a well-known commercial acetate, then in existence, fairly described by the word "purified."

I do not think that this conclusion is affected by the language of the specification, relied upon by complainants' counsel, namely:

"By preference I use the article of commerce known as 'crude brown acetate of lime,' but any other crude acetate may be used with like beneficial results."

The contrast here made is not between the brown and some other color, but is obviously between the lime, referred to, and some other base, as of lead or baryta. I therefore am constrained to hold that on the true construction of the patent, as determined by its language and the state of the art existing at the time of the application for the patent, the process discovered excludes the use of the "gray" acetate, whether of lime or any other base. It must be conceded, from the proofs before the court, that it is impossible for the defendants, or any other manufacturers, to produce acetone on any large commercial scale, without necessarily distilling over, with the acetone, slight quantities of the higher-boiling ketones. Hence the fact that defendants' acetone, as found in their third distillant, contains 3, or even somewhat greater, per cent. of these other ketones, must be, in the absence of a contrary showing, attributed to this necessary incident of distillation, and not to an intentional appropriation of complainants' process. This necessarily incidental and slight use of the substances of complainants' patent cannot be treated as an infringement, without practically putting a stop to all manufacture of chloroform from acetone. This, as already shown, the complainants are not entitled to.

For the reasons, therefore, that the defendants start their process with the use of a purified gray acetate, with the purpose of then, and in subsequent distillations, securing the largest quantity of acetone for use in manufacturing chloroform, and the least possible quantity of other higher-boiling ketones, and because, in their process, they succeed in securing 86 per cent. of acetone, and not over 3 to 5 per cent. of the other ketones, and this only because of the inherent difficulty of altogether expelling such ketones, I am of the opinion that they do

not infringe the complainants' patent, which, properly construed, in the light of the teachings of the art existing at the date of the application, requires the complainants to start their process with the use of a crude brown acetate, with the purpose then and thereafter to secure the least quantity of acetone (the use of which is excluded by their patent), and the largest quantity of the higher-boiling ketones.

I cannot close this opinion without reference to the case of Michaelis v. Roessler, 34 Fed. 325, 38 Fed. 742, which is relied on by complainants' counsel as decisive of this case. I have had the full records of these cases before me, and have given them attentive consideration. There can be no doubt but that the evidence before me bearing on the prior state of the art, and on the important and controlling issue of infringement, is different in important and vital respects from that which was before the court in the New Jersey case. I therefore cannot escape the conviction that, if the same evidence had been before the learned judges who sat in that case, a different result would have there ensued.

A decree must be entered dismissing the bill.